THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT D. SWAGGIRT, Defendant-Appellant.

Second District   No. 2—94—1055

Opinion filed July 24, 1996.

G. Joseph Weller, Valerie C. Faltemier, Amy Kraus, Charles M. Schiedel, and Charles W. Hoffman, all of State Appellate Defender's Office, for appellant.

David R. Akemann, State's Attorney, of St. Charles (William L. Browers, Robert J. Biderman, and Thomas R. Dodegge, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Robert Swaggirt, was convicted of aggravated battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(a)) and armed violence (Ill. Rev. Stat. 1991, ch. 38, par. 33A—2). The trial court sentenced defendant to six years' imprisonment. We reverse defendant's conviction and remand for a new trial.

The following summary of the facts is taken from the record. Defendant was charged by indictment with two counts of aggravated battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(b)(1); Ill. Rev. Stat. 1991, ch. 38, par. 12—4(a)) and one count of armed violence (Ill. Rev. Stat. 1991, ch. 38, par. 33A—2). The indictment alleged that on June 28, 1991, defendant caused great bodily harm to David Sorensen by cutting him on the ear and neck with a machete.

Following various pretrial motions and hearings, the case proceeded to a bench trial on January 7, 1993. At trial, David Sorensen testified that on June 28, 1991, he was celebrating his birthday in a park adjacent to Route 31 near the Fox River in Kane County, Illinois (park). He arrived at 11 a.m. and spent the day drinking. During the day and night he was joined by his sister, Brenda Sorensen, his brother, John Sorensen, and John's girlfriend, Elizabeth Mattson. At 11:15 p.m., Brenda told him that John was fighting nearby. David ran to help John and Mattson. By the time he reached

them, the situation had become so wild it was "every man for himself." Between 30 and 40 people were fighting.

According to David, after the fight had ended and everyone was walking to their cars, he saw an individual he knew as "Bob," whom he identified in court as defendant, approach him with his hands behind his back. Defendant then hit David with a sharp object. David could see defendant because of a nearby bonfire, and he knew defendant because he drank with him several times by the Fox River.

David testified that he was able to get away from defendant and, with Brenda's help, enter the front passenger seat of his car. As Brenda walked to the driver's seat, she became involved in another fight. Because he feared he was losing too much blood, David slid over to the driver's seat and started to drive himself to St. Joseph's Hospital (hospital). He soon became weak, however, and pulled into a gas station. The police arrived and he was taken by ambulance to the hospital. When he was at the hospital, he told Detective Linder of the Elgin police department that he had been cut by a man named "Bob," whom he described as having a mustache and beard. At 9:30 p.m. on June 29, 1991, he selected defendant's photograph from a photographic lineup. According to David, he never hit a woman by the name of Michelle Moore on June 28, 1991.

On cross-examination, David stated that defendant was not involved in the fight when he went to help John and Mattson. He admitted that he was intoxicated at the time of the fight. He further admitted that he told Detective Linder at the hospital that he did not know what had happened at the park and that he only learned what had happened after he underwent surgery and he was told about it. On redirect examination, however, David testified that his testimony in court, as well as his statements to Detective Linder, were based on his own recollections.

Brenda Sorensen testified that she arrived at the park at 9 p.m. on June 28, 1991. At 11:15 p.m., John became involved in a fight. David ran to help John, and she followed. During the ensuing melee, she noticed David standing face-to-face with defendant, although they were not hitting each other. About five minutes later David approached her and told her they had to leave. His face was cut and he was bleeding profusely. When they reached the car, she was attacked by Michelle Moore. David then drove off in the car. Brenda further testified that she never saw David fight or strike Michelle Moore that night. She also admitted that she never saw defendant strike David.

Elizabeth Mattson testified that at 11:15 p.m. on June 28, 1991, a fight started at the park when Michelle Moore slapped her. Michelle Moore's boyfriend then kicked Mattson in the mouth. John then

started to fight with Moore's boyfriend while Moore and Mattson continued to fight. During the ensuing fight, Mattson noticed David backing away from defendant. Defendant had his hands behind his back. Defendant then brought out a long knife from behind his back and hit David across his face with it. David then fell to the ground and defendant walked away.

On cross-examination, Mattson admitted that when she first spoke to Detective Linder in the early morning hours of June 29, 1991, she told him that she did not know what had happened to David. However, in court she claimed that she did know what had happened, but that she did not tell Detective Linder at first because she was afraid she would be arrested for fighting. On redirect, Mattson testified that she never saw David fight with Michelle Moore.

John Sorensen testified that he arrived at the park at 9 p.m. At approximately 11:15 p.m., a woman slapped Mattson, and the woman's boyfriend then kicked Mattson in the mouth. John testified that he then started to fight with the woman's boyfriend. The fight escalated to include everyone nearby. During the fight, he noticed David standing "nose-to-nose" with defendant, although he did not see defendant strike David.

Detective William Linder of the Elgin police department testified that he interviewed David at the hospital in the early morning hours of June 29, 1991. David told him that he was struck by a bearded white male, whose first name he believed was "Bob." Detective Linder testified that he also interviewed Mattson later that day. She told him that David was struck by a man named "Bob."

Dr. Herbert D. Stith, an oral and maxillofacial surgeon, testified that in the early morning hours of June 29, 1991, he examined David at the hospital. David had a laceration which extended from his chin to behind his left ear. He was conscious, "somewhat alert," and seemed to be affected by alcohol. Blood tests indicated that his blood-alcohol level was .189. On cross-examination, Dr. Stith admitted that the amount of blood David lost could have impaired his thinking processes.

At the conclusion of the foregoing testimony, the parties stipulated that the paramedics who transported David to the hospital would testify that David was conscious and oriented when he was placed in the ambulance. The parties also stipulated that Dr. David Lewis would testify that he was on duty in the emergency room at the hospital on June 28, 1991, and that David was alert and conscious when he arrived there at 11:54 p.m. The State then rested.

For his defense, defendant presented the testimony of the following individuals. Dorothy Nolan testified that on June 28, 1991, she

was at the park with defendant and several others. Late in the evening, a fight which included David Sorensen began. Defendant, who was standing next to her, did not become involved in the fight. She did not see a machete in defendant's hands that evening, and she did not see defendant strike David Sorensen with a machete. However, David Moore, Michelle Moore's father, was involved in the fight, and she did see a machete in his hands during the fight.

On cross-examination, Nolan admitted that when she spoke with Detective Linder in the early morning hours of June 29, 1991, she did not tell him that she saw David Moore with a machete. She also admitted that she did not tell this fact to defendant's attorney Stuart Peterson when she spoke to him on August 8, 1991, even though she knew that defendant had been arrested a month earlier for attacking David Sorensen. Nolan also stated that she saw David Sorensen knock Michelle Moore to the ground during the fight. Finally, she admitted that David Moore and defendant do not look alike.

Darrell Shaffer testified that he was at the park with a group of people on June 28, 1991, when the fighting started. This group included himself, defendant, Dorothy Nolan, Lorna Bolen, and David Moore. Michelle Moore was with another group of people. At approximately 11 p.m., a fight started between Michelle Moore and some other women. According to Shaffer, he saw David Moore place a machete in the trunk of his car after the fighting had ended.

On cross-examination, Shaffer admitted that when he spoke to Detective Linder in the early morning hours of June 29, 1991, he initially told him that he did not know anyone in the park with the name of "Bob" (although he later admitted to Detective Linder that he did know a "Bob" who was at the park). Shaffer also admitted that he did not tell Detective Linder that he saw David Moore place a machete into his trunk, even though Detective Linder told him that David Sorensen had been cut at the park.

Okey Terry Bolen testified that on June 28, 1991, he was at the park with his wife, Lorna Bolen, defendant, Shaffer, David Moore, and others. Defendant was by his side throughout the fight that developed later that evening. On cross-examination, Bolen admitted that he did not go to the police with the foregoing information even though defendant, a friend of his, had been arrested for attacking David Sorensen. Lorna Bolen's testimony on direct examination substantially mirrored her husband's testimony. However, whereas he stated that he arrived at the park early in the day, Lorna stated that they arrived at approximately 8:30 p.m.

Susan Kimble testified that she was at the park on the evening of June 28, 1991, with defendant, the Bolens, Shaffer, and Nolan. Defen-

dant never left their group during the fight that developed that evening. Also, she saw David Sorensen slap a woman during the fight. She admitted that she never tried to contact the police after defendant was arrested.

Carl Mathieu testified that he was in the park on the evening of June 28, 1991. Although Mathieu apparently knows defendant, he was not at the park with defendant. According to Mathieu, he saw a man trying to attack a girl. Mathieu then saw an individual who looked like David Moore hit the man with an unidentified object. Defendant was with a group of people when this occurred. Mathieu has known David Moore for approximately six years.

Defendant also offered the testimony of Richard Marston and Billy Gene Hutchinson regarding extrajudicial admissions of guilt made to them by David Moore. The trial court agreed to hear the testimony subject to the State's motion to strike the testimony. The State argued that these alleged admissions did not constitute a declaration against penal interests and thus were inadmissible hearsay.

Marston testified that at 9:30 a.m. on June 29, 1991, he went to the park and met several individuals, one of whom was David Moore. When Marston and Moore were alone, Marston asked him about the previous night's fight. Moore told Marston that he had been involved in the fight. When Marston asked him what happened, Moore told him that he had struck a man with a machete after the man had pushed his daughter.

According to Marston, David Moore is an "acquaintance." Marston has known Moore for 10 years, although he admitted that there was a period of time when he did not see Moore for several years. Marston knows Moore because he would see him between two and four times a month at the Fox River. At the conclusion of Marston's testimony, the trial court granted the State's motion to strike the testimony.

Billy Gene Hutchinson, defendant's stepfather, testified that late in the evening of June 28, 1991, he was at the Walnut Inn in Elgin with Brenda Newberry, Frank Newberry, and defendant's brother, Roger Swaggirt, when David Moore entered and approached them. Moore, who had blood on his shirt, told them that there was a fight in the park and that he had just hit a guy with a machete.

Hutchinson has known Moore for at least 10 years and considers him a friend. Hutchinson stated that he fished and drank beer with David Moore "dozens and dozens of times." However, Hutchinson did not know if Moore was married, if his parents were living, or what his occupation was. At the conclusion of Hutchinson's testimony, the trial court granted the State's motion to strike it.

David Moore testified that he was at the park on June 28, 1991. He then invoked his fifth amendment rights against self-incrimination. The trial court then instructed defense counsel he could not question Moore "about his actions on the night of June 28, 1991, as they may have related to his striking the victim or not." On cross-examination, the State asked, and Moore answered, questions pertaining to conversations Moore had with defendant and Roger Swaggirt about the fight, as well as conversations Moore had with defense counsel and Detective Linder.

Defendant testified that he was at the park with a group of friends on the evening of June 28, 1991. According to defendant, he did not participate in the fight, but merely watched it with his friends. Defendant denied that he argued with or struck David Sorensen that night. Defendant also denied telling Lieutenant Burns of the Elgin police department in the early morning hours of June 29, 1991, that he had no knowledge of the fight. At the conclusion of his testimony, defendant rested his case.

In rebuttal, Lieutenant James Burns of the Elgin police department testified that he interviewed defendant, Okey Bolen, Lorna Bolen, and Susan Kimble at the park in the early morning hours of June 29, 1991. They told him they had no knowledge of the fight that had occurred earlier.

Following closing arguments, the trial court found defendant guilty. In so finding, the trial court stated that "[t]he case swings on credibility and the pendulum falls totally on the side of the prosecution." The trial court then sentenced defendant to six years' imprisonment. Following various post-trial and post-sentencing motions and proceedings, defendant filed this appeal.

Defendant has one contention on appeal: the trial court erred in excluding the testimony of Richard Marston and Billy Gene Hutchinson regarding unsworn extrajudicial declarations of guilt allegedly made to them by David Moore. According to defendant, Marston's and Hutchinson's testimony was admissible because Moore's admissions were statements against his penal interest. The State responds that the trial court did not abuse its discretion in ruling that Moore's admissions did not satisfy the statement-against-penal-interest exception to the hearsay rule. The State alternatively argues that, even if the trial court erred in excluding Moore's admissions of guilt, such error was harmless.

■ Generally, a declarant's unsworn extrajudicial declaration that he, and not the defendant on trial, committed the crime at issue is inadmissible as hearsay even though the declaration is against the declarant's penal interest. *People v. Bowel,* 111 Ill. 2d 58, 66 (1986);

*People v. Townsend*, 275 Ill. App. 3d 200, 205 (1995). Such declarations may, however, be admitted where justice requires. *Bowel*, 111 Ill. 2d at 66; *People v. Lettrich*, 413 Ill. 172, 178 (1952). As the Supreme Court explained in *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038 (1973), "where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049. Thus, where there are sufficient indicia of trustworthiness of such extrajudicial declarations, the declarations may be admitted into evidence under the statement-against-penal-interest exception to the hearsay rule. *Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313, 93 S. Ct. at 1049; *Bowel*, 111 Ill. 2d at 66.

■ The question to be considered in judging the admissibility of declarations of this character "is whether the declaration was made under circumstances that provide 'considerable assurance' of its reliability by objective indicia of trustworthiness." *Bowel*, 111 Ill. 2d at 67, quoting *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 311-12, 93 S. Ct. at 1048-49. *Chambers* established the following four factors to help determine whether there are sufficient indicia of trustworthiness: (1) whether the declaration was made spontaneously to a close acquaintance shortly after the crime occurred; (2) whether the declaration was corroborated by other evidence; (3) whether the declaration was self-incriminating and against the declarant's penal interest; and (4) whether there was an adequate opportunity for the State to cross-examine the declarant. 410 U.S. at 300-01, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048-49; see also *Bowel*, 111 Ill. 2d at 66-67. Other indicia of trustworthiness may also be considered. *People v. Villegas*, 222 Ill. App. 3d 546, 551 (1991); *People v. Kokoraleis*, 149 Ill. App. 3d 1000, 1024 (1986).

Under Illinois law, the presence of all four factors is not a condition of admissibility; rather, the factors are merely indicia of trustworthiness. *People v. Thomas*, 171 Ill. 2d 207, 216 (1996); *Bowel*, 111 Ill. 2d at 67. Just as all four factors are not required to be present to find a statement trustworthy, the existence of one or more of the factors does not make a statement trustworthy. *People v. Carson*, 238 Ill. App. 3d 457, 463 (1992). Ultimately, it is for the trial court to determine by the totality of the circumstances whether it considers the hearsay statement to be trustworthy. *Carson*, 238 Ill. App. 3d at 463. Because the admission of evidence is within the trial court's sound discretion, a reviewing court will not reverse the trial court's decision absent a clear showing of abuse of that discretion. *Thomas*, 171 Ill. 2d at 218.

■ The first factor to help determine whether there are sufficient indicia of trustworthiness is whether the statements were made spontaneously to a close acquaintance shortly after the crime occurred. See *Chambers*, 410 U.S. at 300, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048. The State concedes that David Moore's statements were made spontaneously shortly after the crime occurred. However, it maintains that Marston and Hutchinson were not close acquaintances of Moore. Our inquiry on this factor, therefore, is limited to whether Marston and Hutchinson were close acquaintances of Moore.

Spontaneous admissions to a close acquaintance are apt to be more trustworthy than admissions made to strangers or casual acquaintances. See *People v. Foster*, 66 Ill. App. 3d 292, 295 (1978) ("Spontaneous admissions to a friend or confidant are more likely reliable than calculated statements made to a police officer"). Illinois case law, however, is noticeably silent as to when a person is a "close acquaintance." The courts have found that police officers and prosecutors (see *Thomas*, 171 Ill. 2d at 216; *People v. Rice*, 166 Ill. 2d 35, 44-45 (1995)), defense investigators (see *People v. Cunningham*, 130 Ill. App. 3d 254, 264 (1984)), and virtual strangers (see *People v. Williams*, 131 Ill. App. 3d 597, 606 (1985)) are typically not considered close acquaintances, whereas a girlfriend or boyfriend (see *People v. Keene*, 169 Ill. 2d 1, 29 (1995)) and "friends" (see *Chambers*, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1049) are considered close acquaintances. Unfortunately, these cases provide little guidance where the individual cannot be neatly described as a "friend," "virtual stranger," etc. With this in mind, we turn to the facts of this case.

Regarding the nature of Marston's relationship with David Moore, we conclude that the trial court did not abuse its discretion in finding that Marston was not a close acquaintance of Moore. Marston knows Moore from seeing him two to four times a month at the Fox River, and he has so known Moore for 10 years. Although these facts suggest that Marston and Moore are close acquaintances, Marston himself merely considers Moore an "acquaintance," and Marston did not stay in contact with Moore for several of the years he has known him. Based on these facts, we cannot conclude that the trial court abused its discretion in finding that Marston was not a close acquaintance of Moore.

The trial court also did not abuse its discretion in finding that Hutchinson was not a close acquaintance of Moore. As in Marston's case, certain facts suggest that Hutchinson and Moore are close acquaintances: Hutchinson has known Moore for at least 10 years; Hutchinson considers Moore a friend; and Hutchinson has fished and

drank beer with Moore "dozens and dozens of times." Other facts, however, suggest the opposite: Hutchinson did not know if Moore was married, what his occupation was, or if his parents were still living. Given Hutchinson's ignorance about the most basic facts concerning Moore's personal life, we cannot conclude that the trial court abused its discretion in finding that Hutchinson was not a close acquaintance.

■ The second factor to consider is whether David Moore's statements were corroborated by some other evidence in the case. See *Chambers*, 410 U.S. at 300, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048. Defendant argues that Moore's statements were corroborated by other evidence in the case, such as: testimony from Moore that he was at the park on June 28, 1991; testimony from Brenda and Mattson that they fought Moore's daughter on June 28, 1991; testimony from Nolan that she saw David Sorensen strike Moore's daughter during the fight; testimony from Nolan and Shaffer that they saw Moore with a machete during and after the fight; and testimony from Mathieu that he saw an individual who looked like Moore hit a man with an unidentified object.

Based on our review of the record, Moore's statements were corroborated by other evidence in the case. The combined testimony of Nolan, Shaffer, and David Moore himself placed Moore at the scene of the crime in possession of the type of weapon similar to the one used against the victim. Mathieu's testimony, that he saw a man who looked like Moore hit another man with an unidentified object, suggested that it was Moore, and not defendant, who attacked the victim. Also, the testimony of Brenda, Mattson, Nolan, and Shaffer offered a compelling motive for why Moore would strike David Sorensen— namely, to exact revenge against him for allegedly striking his daughter. Taken together, this evidence amply corroborates Moore's statements.

We reject the State's suggestion that the foregoing evidence is not corroborating because virtually all of it is from the testimony of defense witnesses, witnesses who the trial court later found lacked credibility. First, the State does not cite any authority for the novel proposition that the State's witnesses must be the source of the corroborating evidence. Second, and more importantly, application of the *Chambers'* factors does not involve credibility determinations. *Kokoraleis*, 149 Ill. App. 3d at 1019. Whether Moore's statements are admissible depends ultimately on whether they were made under circumstances that provide considerable assurance of their reliability by *objective* indicia of trustworthiness. See *Bowel*, 111 Ill. 2d at 67. If the testimony of defendant's witnesses is suspect, then this fact goes

to the weight to be accorded such testimony rather than to its admissibility. See *People v. Nally*, 216 Ill. App. 3d 742, 769 (1991). To the extent *People v. Villegas*, 222 Ill. App. 3d 546 (1991), suggests otherwise, we decline to follow it.

■ The third factor to consider is whether David Moore's statements were self-incriminating and against his penal interest. See *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048-49. In the present case, the State concedes that the alleged statements are incriminatory and against Moore's penal interest.

■ The fourth factor to consider is whether there was an adequate opportunity for the State to cross-examine David Moore. See *Chambers*, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1049. As noted, Moore invoked his fifth amendment rights against self-incrimination when he was called to testify. In excluding the testimony of Marston and Hutchinson, the trial court reasoned that the State did not have an opportunity to cross-examine Moore. Defendant contests this reasoning on two grounds.

First, defendant argues that Moore was available for cross-examination, even though he had invoked his fifth amendment rights, because the State could have granted him immunity. We disagree. This court has held that a declarant who invokes his fifth amendment rights and refuses to testify is not subject to cross-examination by the State. See *Nally*, 216 Ill. App. 3d at 770; *Kokoraleis*, 149 Ill. App. 3d at 1023; see also *Townsend*, 275 Ill. App. 3d at 206; *Cunningham*, 130 Ill. App. 3d at 264-65. Although there is case law to the contrary (see *People v. Rivera*, 260 Ill. App. 3d 984, 992 (1994); *People v. Ireland*, 38 Ill. App. 3d 616, 621-22 (1976)), defendant offers us no persuasive reason to depart from our decisions in *Nally* and *Kokoraleis*.

Second, defendant argues that Moore was available for cross-examination because the State was able to ask him certain questions. When Moore invoked his fifth amendment rights, the trial court instructed the parties as follows:

> "I'm instructing you not to ask him anything about his actions on the night of June 28, 1991, as they may have related to his striking the victim or not.
>
> You can ask him for his [*sic*], who he is, what he does, whether he was there, what he might have observed, but as far as his own activities, the Fifth Amendment will protect on that unless you want to grant him immunity, Mr. LoPiccolo."

The State declined to grant Moore immunity. The State then asked, and Moore answered, questions regarding conversations Moore had with defendant, defendant's brother, defense counsel, and Detective

Linder. Defendant reasons that the State therefore had the opportunity to cross-examine Moore about his purported conversations with Marston and Hutchinson.

Again, we disagree. Initially, we note that we are skeptical over whether the State could have asked Moore about his purported conversations with Marston and Hutchinson, because Moore's responses to those questions could have incriminated him and thereby implicated his fifth amendment rights. See *Chambers*, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1049; *Kokoraleis*, 149 Ill. App. 3d at 1022-23.

In any event, the State's cross-examination still would have been limited and insufficient to test fully the trustworthiness of Moore's statements. The State was prohibited from questioning Moore about the key issue raised by Moore's alleged statements: whether Moore struck David Sorensen with a machete. As such, the State was not able to test fully the reliability of Moore's statements and thus was not able to cross-examine him. See *Rice*, 166 Ill. 2d at 44 (codefendant's suppression hearing testimony was not trustworthy; the focus and purpose of the State's cross-examination of the codefendant at the suppression hearing was limited and did not provide the State with an opportunity to test fully the testimony's reliability).

■ The State also urges us to consider additional indicia of trustworthiness. The State claims that the following "indicia" indicate that Moore's statements are not trustworthy: (1) Marston and Hutchinson have a defense bias because they are defendant's friend and stepfather, respectively; (2) Marston and Hutchinson did not report Moore's statements to the police; and (3) Moore's statements are merely cumulative of defendant's other witnesses.

Although we may consider additional indicia of trustworthiness (see *Kokoraleis*, 149 Ill. App. 3d at 1024), the "indicia" cited by the State are not really indicia at all. The first two "indicia" cited by the State, that Marston and Hutchinson have a defense bias and that Marston and Hutchinson did not report Moore's statements to the police, concern whether Marston's and Hutchinson's testimony is credible. However, whether an extrajudicial statement is admissible depends ultimately on whether it was made under circumstances that provide considerable assurance of its reliability by *objective* indicia of trustworthiness (see *Bowel*, 111 Ill. 2d at 67), not on whether a witness is credible (see *Nally*, 216 Ill. App. 3d at 769; *Kokoraleis*, 149 Ill. App. 3d at 1019). As such, whether Marston and Hutchinson were credible is irrelevant for determining whether their testimony was admissible.

The final "indicia" cited by the State—that Moore's statements

are merely cumulative of the testimony of defendant's other witnesses—also is not an indicia of trustworthiness. Logically, this "indicia" is implicated only if evidence is presented in corroboration of the declarant's statement. If no such evidence is presented, the declarant's statement obviously could not be cumulative. Therefore, if we accept the State's argument that Moore's statements are not trustworthy because they are cumulative of other testimony, we would be holding, in effect, that a declarant's statements may not be trustworthy if they are corroborated by other evidence. We refuse to endorse this absurd position because it conflicts with the well-established proposition that corroborating evidence is an indicia of the trustworthiness of a declarant's statement. See *Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048-49; *Bowel*, 111 Ill. 2d at 66-67.

Thus, viewing the circumstances as a whole, we conclude that David Moore's statements had sufficient indicia of trustworthiness so as to warrant their admission at trial. Although Moore was not subject to cross-examination by the State, his statements were against his penal interests, and they were amply corroborated by other evidence in the case. The statements were also made spontaneously shortly after the crime occurred. Moreover, although the statements were not made to close acquaintances, they were made to individuals who were more than casual acquaintances of Moore. In light of the constitutional guarantee that criminal defendants should have a "meaningful opportunity to present a complete defense" (*California v. Trombetta*, 467 U.S. 479, 485, 81 L. Ed. 2d 413, 419, 104 S. Ct. 2528, 2532 (1984)), we conclude that the trial court abused its discretion in excluding the testimony of Marston and Hutchinson.

■ The State alternatively argues that, even if the trial court erred in excluding the testimony of Marston and Hutchinson, such error was harmless. The test for harmless constitutional error is whether the error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, 87 S. Ct. 824, 828 (1967); *People v. Wilkerson*, 87 Ill. 2d 151, 157 (1981). There are three approaches for measuring whether the error is harmless beyond a reasonable doubt: (1) focusing on the error to determine whether it might have contributed to the conviction; (2) examining the other evidence in the case to see if overwhelming evidence supports the conviction; and (3) determining whether the evidence is cumulative or merely duplicates properly admitted evidence. *Wilkerson*, 87 Ill. 2d at 157; *People v. Cannon*, 244 Ill. App. 3d 45, 50 (1992). In the present case, the State argues that any error in the trial court's decision to exclude Moore's statements was harmless under tests (1) and (3). We disagree.

■ First, the error could have contributed to defendant's convictions. The trial court found that the case hinged on the credibility of the witnesses and that the State's witnesses were more credible than defendant's. As such, the State argues, the failure to admit Moore's statements was harmless because it would not have changed the trial court's assessment of defendant's witnesses. However, the error in this case is not harmless precisely because this case hinged on the credibility of the witnesses. In assessing the credibility of the witnesses, the trial court could consider only admissible evidence. If admitted, Moore's statements, as the crux of defendant's case, *could have* changed the trial court's assessment of the credibility of the witnesses.

Second, the evidence was not merely cumulative. To conclude, as the State would have us, that the exclusion of Moore's statements was harmless error would be to ignore the importance of the excluded statements to defendant's ability to present and argue his theory of the case. While the testimony of several witnesses did support defendant's theory that Moore struck David Sorensen, this testimony arguably pales in significance compared to Moore's statements. Under the circumstances of this case, we cannot conclude that Moore's statements were cumulative; rather, they constituted evidence which was essential to defendant's ability to present and argue his theory of the case.

For the foregoing reasons, the judgment of the circuit court of Kane County is reversed, and the cause remanded for a new trial.

Reversed and remanded.

INGLIS and THOMAS, JJ., concur.